**Theresa I. OPARA**

v.

**The MODERN MANUFACTURING COMPANY.**

**Civ. No. HM74–5.**

United States District Court,
D. Maryland.

July 11, 1977.

---

**1042**

Luther C. West and Patrick A. U. Opara, Baltimore, Md., for plaintiff.

Earle K. Shawe, Stephen D. Shawe and Arthur M. Brewer, Baltimore, Md., for defendant.

HERBERT F. MURRAY, District Judge.

This case was tried without a jury on April 11–15 and 27, 1977 with final argument on June 3, 1977 and is now ripe for decision. Although not separately enumerated herein, the court's findings of fact and conclusions of law as required by Rule 52, F.R.C.P. are contained in this memorandum opinion.

Theresa I. Opara, a citizen of Nigeria presently residing in Maryland on immigrant status, commenced this action on January 3, 1974 alleging that the Modern Manufacturing Company (hereinafter Modern), a Delaware corporation with significant business interests in Maryland, had utilized racially based work practices, compensation scales and personnel classifications in violation of rights protected by 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981.

Plaintiff applied for employment with the Modern Manufacturing Company on November 3, 1972 as a sewer. At the time she applied for employment, Modern had no positions available at its plant. On November 5, 1972, the plaintiff was called by the man who had interviewed her, Mr. Eugene Armada, and was offered employment as a tableworker. The plaintiff accepted the employment. There were still at that time no sewer positions available at Modern. At the time she was hired, she received the minimum hourly wage until March, 1973 at which time she began receiving compensation on the piece rate system.[1] Plaintiff asserts that at the time she was hired as a tableworker, Mr. Armada promised that she would be transferred to a machine as soon as a position became available. On the whole evidence, the court concludes that this promise was not made. It appears from the testimony of each and every defense witness that such a promise would have been against the firm policy that employees were not to be transferred from one position to another. Also, Mr. Armada specifically denied making such a promise. Further, the plaintiff signed a form at the time of her employment that she did not expect any other position than the one for which she was hired. Although the court finds that the use of such a "take it or leave it" employment form to be questionable practice, the court does recognize that her signing of the form which stated that she

---

1. The time it takes to perform a particular operation determines the piece work rate for each manufacturing function.

did not expect to be transferred is not consistent with her assertion that she was promised a transfer to a sewer position and that she took the job as a tableworker on that basis.

Plaintiff was hired to pair-in yokes and collars and to pair-in backs. At the time she was placed on the piece work rate she was told that she would pair 20% of the yokes and collars while her white co-worker, Ms. Louise Martin, who had been with Modern for many years, was to perform 80% of the pairing-in of yokes and collars.[2] When the plaintiff finished her percentage of that task, she was to pair-in backs and perform any other tasks at Modern which needed to be done. From time to time, the plaintiff worked in the maintenance or pressing departments and on the sewing machine. Whenever she performed these other tasks, the plaintiff received at all times the hourly wage that she had established at the piece work rate while pairing-in yokes and collars. Plaintiff asserts that she was often forced to sit idle while her white co-worker paired-in yokes and collars and was not paid during that time. The evidence presented at trial did not support this assertion. The pay records of the plaintiff and her co-worker indicate that her co-worker worked twenty hours more over a 19-week period than did the plaintiff. The evidence also indicated that the plaintiff often reported for work late on Mondays and left work early. Thus, the little over an hour difference per week between the plaintiff and her co-worker appears to be as a result of the work habits of the plaintiff rather than a forced idle period on the part of the employer. Further, Ms. Goldring, an employee at Modern who worked in close proximity to the plaintiff, indicated that she had never seen the plaintiff sitting idle. The fact that her co-worker made a considerably greater amount of money, even taking into account the twenty hours, during that period is accounted for by the fact that her co-worker was able to produce more units per hour than was the plaintiff. Both employees were paid the same piece work rate.

At approximately the same time that the plaintiff was placed on the piece work rate, the plaintiff began complaining to Mr. Armada that she was not transferred to a sewing machine. Plaintiff testified that Mr. Armada made racially disparaging remarks. Mr. Armada denied making any racial insults and Ms. Goldring testified that she heard none made. Plaintiff introduced no witnesses to support any of her testimony in this regard. In June, 1973, the plaintiff, still a tableworker, quit her employment at Modern. Plaintiff asserts that the percentage system under which she was employed and the failure of the company to transfer her to a sewing position when one became available was racially discriminatory.

The court turns first to the plaintiff's assertion that the company's failure to provide her with a sewing job was racially discriminatory. It appears to this court that the gravamen of the plaintiff's complaint is that she was not transferred to a sewing position when one became available. Although plaintiff's proposed findings of fact and conclusions of law appear to imply a cause of action based on the original hiring, if plaintiff is contending that she should have been hired as a sewer rather than a tableworker and that that act was discriminatory, plaintiff's claim surely must fail. Plaintiff must show "(i) that [s]he belongs to a racial minority; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applications; (iii)that, despite (her) qualifications, [s]he was rejected; and (iv) that after (her) rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Assuming for purposes of argument that the plaintiff was qualified as a sewer, plaintiff failed to introduce any evidence that Modern was seeking applications

---

**2.** The percentage of work that the employee will receive will vary depending on the amount of work which the senior employee is unable to perform.

for positions as sewers and that after the plaintiff was hired as a tableworker that Modern continued to seek applications from individuals desiring to be sewers. Accordingly, it is clear that the plaintiff has not made out a case of racial discrimination in her hiring.

Thus, the issue is simply whether Modern's failure to transfer the plaintiff to a sewer's position when one became available was racially discriminatory. Each and every witness who testified for the defense at the time of trial indicated that it was the long standing policy of the company not to transfer its employees from one department to another. The reason behind this policy is to insure the continued flow of a garment through the company's various steps which would not take place if employees were transferred from one position to another and learning new skills. Additionally, if an employee who was trained to do one particular operation, and thereby established an hourly rate on the piece work method of compensation, was transferred to another position, that employee would have to be paid that same wage while he learned the new operation. This policy clearly affected more white employees than black employees.[3]

Plaintiff's basis for her assertion that the company's failure to transfer her to a sewing position was racially discriminatory is found in her contention that the job of sewer is a better job than that of tableworker in terms of pay and that it was the intent of Modern to hire blacks into those positions that are lower paying. In her sole support for this conclusion, the plaintiff introduced into evidence various statistics of pay disparity and a comparison of the number of blacks employed as sewers at Modern with the number of black sewers in the community.

■ As stated in *Barnett v. W. T. Grant Company,* 518 F.2d 543 (4th Cir. 1975), a class action Title VII case, "statistics can in

appropriate cases establish a prima facie case of discrimination without the necessity of showing specific instances of overt discrimination." *Id.* at 549. But as stated in *Roman v. ESB, Inc.,* 550 F.2d 1343 (4th Cir. 1976), another class action Title VII case, "the absence of other evidence of discrimination should be considered in determining whether a prima facie case is made, just as the presence of other evidence of discrimination should be considered in arriving at the same conclusion." It is clear to this court from this most recent decision of the Fourth Circuit relating to the relevance of and weight of statistical evidence, that the introduction of statistical evidence does not automatically make out a prima facie case. Rather the court must look to all evidence introduced at the time of trial. In that regard, the court emphasizes from the outset that the only evidence introduced by the plaintiff to support her conclusion that the failure to transfer employees was racially motivated is the introduction of statistics and defendant's claimed lack of hiring standards. There was no evidence introduced by the plaintiff that the company transferred other employees, black or white, from one job to another.

■ Even if this court were to find that the plaintiff had made out a prima facie case by her introduction of statistics, "it is worthy to note that the establishment of a prima facie case does not require a finding in favor of the party establishing it, but only permits that finding." A risk of non-persuasion is yet on the plaintiff, . . . "just as is a risk of non-persuasion on the defendant if he does not rebut the prima facie case." *Id.* at 1350–1351.

■ Furthermore, the instant suit is not a class action, but rather an individual suit on behalf of one plaintiff. As such, statistics do not play as vital a role in the determination of the issues before this court as they would if this case were a class

---

**3.** Plaintiff's exhibit 3 indicates that 22 blacks out of 153 workers were tableworkers in 1972 and the same number of blacks out of 142 employees were tableworkers in 1973.

action. As stated in *Harper v. TWA,* 525 F.2d 409 (8th Cir. 1975), "while statistics may not be a determinative factor in an individual, as opposed to a class action discrimination case, they may often be probative and supportive of an individual employees' allegation." *See also Terrell v. Feldstein Co., Inc.,* 468 F.2d 910 (5th Cir. 1972). In *Roberts v. St. Louis Southwestern Railway Co.,* 329 F.Supp. 973 (E.D.Ark.1971), the court pointed out the differing weight of statistical evidence in determining class action claims and individual claims. The court stated that

It is recognized that the company's extremely low number of black employees in 1968, at the time of the bringing of this suit and since, reflect a disinclination of implementing the defendant company's announced policy of equal employment opportunities and it may very well be shown that 'statistical' evidence would demonstrate discriminatory practices as applied to the class of blacks in general, the preponderance of the evidence, however, is not weighted on the side of the plaintiff as an individual.

With these standards in mind, the court is now prepared to review the statistical evidence introduced at the time of trial.

Plaintiff's Exhibit 11 contains several tables comparing the wages received by various groups of employees. Table 2 of Exhibit 11 indicates that black tableworkers received less yearly income than white tableworkers in 1972. From this fact, plaintiff contends that black employees are placed in the lower paying tableworker jobs. Table 3 of Exhibit 11 indicates that black sewers received less yearly compensation than did white sewers in 1972. Again, plaintiff contends that black employees are placed in the lower paying sewing positions. Tables 4 and 5, respectively, indicate the same comparisons for 1973. The remaining tables are various compilations of the same data. At the time of trial, there was extensive testimony on the salary structure of Modern. As has been indicated, employees were first compensated on an hourly wage equal to the minimum wage while they were being trained. This was done so that the employees would earn a livable wage during the time they were in training, as they would be too slow to earn enough on the piece rate method of compensation. At such time as the employee was sufficiently familiar with the operation that she was assigned to perform, the employee was placed on a piece rate work arrangement. The time it takes to perform a particular operation determines the piece work rate for each manufacturing process. The piece work rate was designed so that all employees would receive the same amount per hour if they all performed at the same rate of speed. Thus, any resulting differences in pay would be the sole result of speed in completing the task. For instance, if it would take an average employee one hour to complete ten pieces of a particular operation, then the employee would receive X for those ten pieces. If the average employee could complete 100 pieces in an hour doing a different operation then that employee would receive X for those 100 pieces. The uncontradicted testimony at trial indicated that each and every piece work rate was determined in that manner so that no operation was any better paying than another operation. Thus, the hypothetical employee would earn the same income at any task she would perform. Therefore, the difference in salary received by any employee would be solely due to the employee's dexterity at the particular job required to be done and the amount of time the employee actually spent working. As indicated by the witness, Ms. Goldring, some employees take 15 minute breaks each morning and each afternoon while others work straight through such breaks. The latter employees end up receiving more money at the end of the week as they are able to produce more units per hour and thus establish a higher rate per hour. Defendant's Exhibits 3–5 indicate that employees' hourly earnings varied greatly although they were performing the same operation and receiving the same rate

of pay. This was true of the plaintiff and her co-worker. The speed in completing each piece and the amount of time actually spent working accounts for the difference in salary received by the plaintiff's co-worker and plaintiff.[4]

Thus, this court does not find plaintiff's statistics in light of the piece work rate of employment particularly persuasive. Therefore, this court does not find the only identifiable factor explaining the disparity in pay to be race. Plaintiff has introduced absolutely no evidence that there are particular operations whose piece work rate forces an employee to earn less money per hour and that black persons occupy those positions. Defendant's evidence in answer to plaintiff's Exhibit 11 appears to totally negate any discriminatory inference that could be drawn from those statistics.

It appears to this court that it is likely that the plaintiff became discontented with her job as a tableworker when she learned that the piece work rate for many of the sewing operations was substantially higher than that of many of the tablework operations; that is, that an employee performing a sewing operation would have to produce far fewer pieces to receive the same amount of money as the tableworker would have to produce. While to the layman inexperienced in piece rate compensation this fact would appear to indicate that the sewers received more compensation than did the tableworkers, it does not indicate that the sewing position was a better paying position. The sole reason why the sewer would be required to complete far fewer pieces to receive the same amount of money as the tableworker, is because the rate was designed to take her the same amount of time to complete those few pieces as it would the tableworker to complete the more numerous amount of pieces. Thus, in

the long run what appeared to be a higher rate of pay was not such.

■ Accordingly, this court finds the statistics of the plaintiff contained in Exhibit 11 to be not particularly persuasive in light of the uncontradicted testimony of how wages were determined. In light of that testimony, this court will not speculate from the statistics contained in Exhibit 11 that blacks are being funneled into lower paying jobs at Modern either within or between each division, that is, the tableworkers and sewers. This conclusion is further supported by the exhibit of defendant which indicates that during the same period of time, the total income earned by all tableworkers as compared to all sewers was approximately the same if not greater for the tableworkers, *see* defendant's Exhibit 6, and that the average hourly wage of tableworkers was virtually the same as that of sewers.[5] Therefore, this court determines that the defendant Modern's policy of not transferring blacks does not operate to keep blacks in lower paying jobs.

■ Although the court is aware from the evidence introduced by the plaintiff that there is a higher percentage of blacks hired as tableworkers than hired as sewers and that a greater percentage of black sewers live in the community than were employed at Modern, the court cannot conclude from this statistic that this disparity is due to racial discrimination. *See Roman v. ESB, supra,* at p. 1353. The statistics do not indicate to this court that Modern systematically excluded blacks from its sewer positions. In fact, numerically there are more black sewers than black tableworkers. There was no evidence introduced at trial to indicate that the sewer positions were reserved for white employees and that blacks who applied for positions as a sewer were turned down for that position and were hired only as tableworkers. The setup of

4. This is true during the time the plaintiff was a piece work rate employee.

5. Defendant's Exhibit 3A indicates that the average hourly wage for tableworkers was $3.61 and for sewers $3.60 in 1972. Defendant's Ex-

hibit 4A indicates that the average hourly wage for tableworkers was $3.87 and for sewers $3.81 in 1973. Defendant's Exhibit 5A for 1974 indicates $3.86 for both tableworkers and sewers.

the production floor placed sewers and tableworkers side by side. Thus, we are not dealing with even a possibility of a racially stratified job environment. *See McDonnell Douglas Corp. v. Green, supra.*

Further, this court would like to point out that there was no evidence introduced in this trial that the plaintiff was in fact qualified to be a sewer at Modern. Although she had training in Nigeria, she was never employed as a sewer in Nigeria and was only employed as a sewer in this country for approximately two weeks. Her home sewing experience in Nigeria would not necessarily qualify her for a position as a sewer in a factory. Mr. Armada testified that he examined her sewing work and found it to be of poor quality as the plaintiff sewed with a twist.

While certain of Modern's practices in regard to hiring, specifically its failure to advertise available positions and its subjective hiring criteria may well be suspect, this case is not a case challenging those practices. This is not a class action case but simply one asserting individual claims of discrimination. Such evidence, while it may be probative of intent to discriminate, has not been so in the instant case in this court's view. It does not appear to this court that any of the hiring techniques reflect the intent of the company to discriminate against its hired employees. This court finds that the plaintiff has not sustained her burden of showing that she was in fact discriminated against by reason of the company's failure to transfer her to a sewing position. This court specifically finds that a sewing position was no more lucrative a position than the one held by the plaintiff. Nor has the plaintiff even contended that in some way other than salary the position is a "better" position than a tableworker's job. Plaintiff has failed to introduce any concrete evidence of racial discrimination in the company's failure to transfer the plaintiff, and this court is not persuaded by the statistical evidence. The plaintiff has not successfully overcome her risk of nonpersuasion. *Roman v. ESP, supra.*

In order for the plaintiff to prove her charge of racial discrimination on the part of Modern, plaintiff puts much weight upon a form she signed at the time she was employed, which the court has already discussed briefly. While the use of the form which required that the employee waive reporting and waiting time might well support a claim of racial discrimination in a class action suit or constitute an unfair labor practice, the plaintiff has not shown any injury as a result of this form. The plaintiff was never forced to waive waiting or reporting time. This is an individual action and not one for class relief. Similarly, the fact that the form the plaintiff signed left blank the actual job she was to perform does not indicate to this court racial discrimination as to this plaintiff. Plaintiff argues that "the practice of leaving the exact job offered to a prospective employee blank, permits the employer to change or switch jobs which it prefers that employee to fill and it gives him the right to retain this option until the very last minute before the employee actually goes to work." While this fact may well be true, there is not even an allegation in this case that that is what in fact happened to the plaintiff. Accordingly, plaintiff's reliance on this form as direct or inferential support for her allegations of racial discrimination is totally misplaced.

The court now turns to the plaintiff's second claim of racial discrimination in connection with the percentage system under which she was employed. Plaintiff asserts that her assignment to a percentage job which gave her twenty percent of the yokes and collars to pair and twenty percent of the backs to pair was racially discriminatory. Plaintiff alleges that as a result of that allocation of the work, the plaintiff was forced to sit idle while her white co-worker was permitted to work. As has already been discussed, the plaintiff

did not suffer monetarily as a result of the system. The fact that her wages were significantly lower than those of her co-worker was not due to this system, but rather was due to her voluntarily taking time off from her employment and her speed at completing her work. The testimony of Ms. Goldring indicated that the plaintiff did not sit idle for any period of time. This court therefore finds that the percentage system of allocating work did not work to the detriment of the plaintiff. Additionally, this court notes that although plaintiff contended that work on the percentage system resulted in lower pay, the plaintiff has not even contended that blacks were placed on the percentage system more often than white employees. Thus, even if this court found that the plaintiff suffered monetarily due to the percentage system, there is no evidence that this was the result of racial discrimination. Defense Exhibit 7 indicates that only two black employees, including the plaintiff, were on the percentage system while eight whites were on that system during the time plaintiff was employed at Modern. Thus, in light of the fact that the plaintiff did not suffer monetarily due to the percentage system, that there is no evidence that working the percentage system was a less desirable job and that there is no evidence that blacks were placed in that position more frequently than white employees, this court concludes that there is no racial discrimination involved in the placing of the plaintiff on the percentage system. The court therefore will enter judgment for the defendant.