**Willie J. JOHNSON, Plaintiff,**

v.

**FULTON SYLPHON DIVISION, ROBERTSHAW CONTROLS COMPANY, Defendant.**

Civ. No. 3–76–197.

United States District Court,
E. D. Tennessee, N. D.

Oct. 31, 1977.

A. Yes.

A. Yes.

Q. Did you know they were stolen—

A. Yes.

Q. —when you were in the car with them?

A. Yes.

Q. Did you have possession of them?

A. Yes.

THE COURT: I'm satisfied there is a sufficient factual basis for the entry of the plea. Tr. 16–17.

Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Willie J. Johnson, the plaintiff, was employed in 1968 by Fulton Sylphon Division of Robertshaw Controls Company, the defendant, and he worked at defendant's plant in Knoxville, Tennessee off and on until he was finally discharged on October 20, 1976. In this suit, plaintiff alleges that his employer discriminated against him because of his race when he was not transferred and promoted to a newly-created department in 1971. He further claims that after he was finally transferred to this new department in 1975, he was suspended and subsequently discharged by the defendant in retaliation for the exercise by him of his rights under Title VII. As relief, plaintiff seeks a declaratory judgment, an injunction reinstating him to his previous employment and transferring him to another plant owned by the defendant, back pay, restoration of all employee benefits and seniority, attorneys' fees and costs.

In opposing the plaintiff's claims for relief, the defendant asserts that plaintiff was not transferred or promoted to the newly-created department until June 1975 because of his lack of diligence as demonstrated in particular by his excessive absenteeism and because of his inability to meet the performance standards of the new department. Defendant further contends that plaintiff was suspended and eventually discharged in October 1976 because of his continued and excessive absences and other misconduct.

The case came on for trial before the Court sitting without a jury. Various witnesses testified, and numerous exhibits were entered in evidence. Pursuant to the Pretrial Order, the issues presented to the Court were (1) Did the defendant discriminate against the plaintiff because of his race between 1971 and 1975 with respect to plaintiff's application for transfer to the Numerical Control Department? (2) Did the defendant discriminate against the plaintiff because of his race with respect to plaintiff's suspension and discharge in Octo-

Dean Hill Rivkin and Carol S. Nickle, University of Tennessee Legal Clinic, Knoxville, Tenn., for plaintiff.

Robert S. Young, Jr., and Rudolph L. Ennis, Knoxville, Tenn., for defendant.

ALEXANDER HARVEY II, District Judge (sitting by designation):

In this civil action, plaintiff, a black male, is seeking damages and other relief from his employer under Title VII of the Civil

ber 1976? (3) If the plaintiff prevails, what is the relief to which he is entitled?[1]

The original complaint in this case was filed as an individual action brought by the plaintiff against the corporate defendant. Subsequently, plaintiff sought leave of Court to file an amended complaint, which asked that the case be certified as a class action pursuant to Rule 23(b)(2), F.R.Civ.P.[2] In a five-page Order dated November 23, 1976, Judge Taylor, finding that the plaintiff's claims were too individualized to warrant class action treatment and that the amended complaint did not satisfy the requirements of Rule 23, denied plaintiff's application that the case proceed as a class action.[3] Thus, the case came on for trial on plaintiff's individual claims asserted against the one corporate defendant.

### The applicable legal principles

■ In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a new three-step procedure for the determination of racial employment discrimination cases brought under Title VII of the Civil Rights Act of 1964. *See Franklin v. Troxel Manufacturing Co.*, 501 F.2d 1013, 1014 (6th Cir. 1974). As the first step, the plaintiff is required to carry the burden of proving a prima facie case. In *McDonnell Douglas Corp.*, Mr. Justice Powell said the following (411 U.S. at page 802, 93 S.Ct. at page 1824):

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

At this point in the Opinion, the following was said by way of a footnote (411 U.S. at 802, fn. 13, 93 S.Ct. at 1824):

> 13. The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [complainant in this case] is not necessarily applicable in every respect to differing factual situations.[4]

If the plaintiff satisfies this initial requirement, the burden then shifts to the defendant to establish a legitimate, nondiscriminatory reason for the action taken.

> The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the [respondent's] rejection. We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire. Here petitioner has assigned respondent's participation in unlawful conduct against it as the cause for his rejection. We think that this suffices to discharge petitioner's burden of proof at this stage and to meet respondent's prima facie case of discrimination. (411 U.S. at 802–803, 93 S.Ct. at 1824)

But even if a defendant satisfies its initial burden and meets a plaintiff's prima facie case, that is not the end of the inquiry

---

1. Proposed Findings of Fact and Conclusions of Law were submitted by the parties prior to the trial. Following the trial, the parties submitted post-trial briefs.

2. Plaintiff's original counsel withdrew from the case several months after suit was filed, and plaintiff thereafter secured the services of new counsel who filed a motion for leave to file an amended supplemental class action complaint.

3. Judge Taylor did permit the plaintiff to file the amended complaint, which expanded some-

what the claims and prayer for relief of the original complaint.

4. *McDonnell Douglas Corp. v. Green, supra*, was concerned with a charge of discrimination by an employer in failing to re-employ the plaintiff. The same test would appear to be applicable in a case such as this one involving alleged discrimination in failing to promote or transfer a plaintiff. *Thompson v. McDonnell Douglas Corp.*, 416 F.Supp. 972, 980 (E.D.Mo. 1976), *aff'd*, 552 F.2d 220 (8th Cir. 1977).

which a trial court should make, because an otherwise valid reason advanced by the employer may be used as a pretext for the action taken. The third step of the procedure in question was described by Mr. Justice Powell as follows:

> Petitioner's reason for rejection thus suffices to meet the prima facie case, but the inquiry must not end here. While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the "stall-in" were nevertheless retained or rehired. Petitioner may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races.

> Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks. (411 U.S. at 804–805, 93 S.Ct. at 1825)

In footnote 19 at page 805, 93 S.Ct. 1817, Mr. Justice Powell further observed that the trial court may consider the racial composition of a defendant's labor force as itself reflective of restrictive or exclusionary practices, but cautioned that such general determinations, while helpful, may not be in and of themselves controlling as to "an individualized hiring decision," particularly in the presence of an otherwise justifiable reason for rejection of the employee. This case presents just such an individualized decision. What the Court must determine here is whether plaintiff's irregular work habits over the years and his purported lack of other qualifications for the position amounted to sufficient justification for defendant's refusal to transfer him into the Numerical Control Department between 1971 and 1975 and for defendant's later suspension and discharge of plaintiff in 1976 after he had finally been employed in the position he had earlier sought. A detailed inquiry into the facts is necessary before such a determination can be made.

## I

### The facts

The Fulton Sylphon Division of the Robertshaw Controls Company operates a large manufacturing plant in Knoxville, Tennessee. During the years involved in this suit, over 800 hourly employees and over 300 salaried employees worked for Robertshaw. According to 1970 United States Census figures, the work force in the Knoxville Standard Metropolitan Statistical Area (SMSA) was then composed of 6.5% blacks. 1975 figures of the Tennessee Department of Employment Security indicates that blacks then constituted 6.2% of the work force in the Knoxville SMSA. From 1972 through 1976, the work force of defendant Robertshaw has been between 4.55% and 5.91% black. At the time of the trial, blacks constituted 5.5% of defendant's work force.

The plaintiff, a black male, was just barely eighteen years of age when he started his employment with the defendant as a stock boy in the Corrugating Department on November 19, 1968. Plaintiff worked for defendant off and on until he was finally discharged on October 20, 1976. At various times during this eight-year period, particularly in the earlier years when he had little

seniority, plaintiff had been laid off.[5] Furthermore, as more fully discussed herein, plaintiff was absent from work on many other occasions because of health problems, suspensions or other reasons.

Having married at the young age of sixteen, plaintiff was during the times involved here the father of three young children. However, marital problems developed, and plaintiff and his wife separated in 1972. Plaintiff could not pay his bills during the years in question and in 1971 went through voluntary bankruptcy proceedings. In October 1975, he chose a lay-off rather than a transfer to another department, so as to avoid garnishment of his wages by creditors. When he started work for the defendant, plaintiff was to all intents and purposes a high school graduate.[6] From June until September 1968, plaintiff had received some training at a federally-supported program for disadvantaged persons conducted in Oak Ridge, Tennessee. However, plaintiff did not complete that program.

In January 1971, defendant created a new department, which was called the Numerical Control Department (hereinafter "the N. C. Department"). In this department, employees were to operate expensive new machines[7] to be used in the cutting and forming of metal parts for various complex assemblies. Both the Company and the Union[8] agreed that there were no employees at the plant then qualified to perform the work, since the sophisticated equipment was tied to computer read-outs and data processing and since electronically-coded tapes were to be used to set up the machines, which were entirely new to the factory operation. At the outset, defendant planned to employ only a few persons in the new department, and a notice was posted throughout the plant inviting applications from employees who wished to be considered for transfer.

Barely twenty years of age, plaintiff applied for a transfer to the N. C. Department in January 1971, because such a transfer would be a promotion and would increase his earnings. In all, thirty-three employees of defendant requested a transfer, twenty-nine whites and four blacks, including the plaintiff. Plaintiff's application was not accepted, and four white individuals were originally transferred into the new department in 1971.

Beginning early in his employment career, plaintiff's work habits were irregular, and numerous absences and latenesses were recorded in his personnel file. Defendant had adopted written rules covering the conduct of its employees, and a copy of the rules was posted in each department. An employee who was excessively absent or tardy was to be first orally warned by his foreman, who was required to make a written record of the fact that he had warned the employee in question. An employee absent without permission five days within a four-month period was to be given a five-day disciplinary lay-off and receive a final written warning. An employee who was absent seven days without permission within a four-month period was to be discharged. An employee knowing in advance that he had to be absent on business or for some other reason was required to obtain advance permission from his supervisor; otherwise, he would be considered as being absent without permission.

On January 4, 1970, plaintiff was verbally warned about returning to work late after a break, and a record of such warning was placed in his personnel file. Plaintiff was

---

**5.** Plaintiff was laid off for lack of work on January 16, 1970 and was re-employed on February 11, 1970; on May 1, 1970 and re-employed on June 15, 1970; on September 13, 1971 and re-employed on September 15, 1971; and on November 24, 1971 and re-employed on December 20, 1971.

**6.** Defendant's records have treated plaintiff as a high school graduate.

**7.** The N. C. Department was to use machinery and equipment costing from $100,000 to $500,000 per unit. The new machines were more expensive than any equipment previously acquired by defendant.

**8.** Plaintiff and other employees at Robertshaw were members of Local 5431 of the United Steel Workers of America, AFL–CIO.

absent from work without permission for six days during the four-month period which began July 1, 1971, and he was given a written warning concerning these absences on October 5, 1971. On May 4, 1972, he was verbally warned that he had been absent excessively. On that occasion, his foreman showed him his record for 1971 when he had been absent for twenty days. When it was pointed out to him that he had been out another six days through May 4, 1972, plaintiff claimed that he had been sick during those days. His foreman then warned him that unless he improved, drastic steps would be taken. Again, a written record was made of this warning.

On October 31, 1972, plaintiff was again advised in writing that he had been absent excessively and that if he continued such absences in the future, his services with the Company would be terminated. Finally, on May 16, 1973, plaintiff was in fact terminated because of his absenteeism, and a formal separation notice was sent to him.

Following his discharge in May of 1973, plaintiff's Union interceded in his behalf in an attempt to have him reinstated. Discussions were held between representatives of the Union and representatives of the defendant, and eventually it was agreed that plaintiff would be reinstated without any loss of seniority but without back pay, effective Monday, July 30, 1973. A formal Memorandum of Agreement was signed by the plaintiff, by a representative of the Union and by the plant superintendent. This Agreement, dated July 13, 1973, recited that plaintiff had been warned previously "concerning being absent excessively and also concerning being absent without permission," and that on a number of occasions plaintiff had shown a poor attitude with regard to work assignments given to him by group leaders. At the request of the Union, the Company agreed to give plaintiff another chance, with the understanding that if he were "absent excessively for any reason in the future or if he again shows a poor attitude with regard to work assignments or other matters, his employment will be terminated and no grievance will be filed with regard to such termination."

On February 6, 1974, plaintiff was given a verbal warning for excessive tardiness. Also in that same month, he missed several days from work when he participated in an unauthorized, wildcat strike. In March of 1974, plaintiff injured his back while working,[9] and he was confined to a hospital from March 14, 1974 until April 6, 1974, where his injury was diagnosed as a low back strain.[10] On April 3, 1974, plaintiff was advised that because of the indeterminate nature of his injury, his records were being transferred to the defendant's inactive files until such time as he was able to return to work. In the letter he received from the personnel manager, he was invited to return to work when he recovered, and on June 3, 1974, plaintiff did return to his former job.

On February 5, 1975, plaintiff was advised in writing by his foreman that on several days in January and February 1975, he had furnished false information to the Company in that he had not actually worked the time indicated on his daily time summary. For this infraction, he was laid off for five days from February 6, 1975 until February 12, 1975, and was warned that if he again furnished false information to the Company, more serious disciplinary action would be taken.

In May 1975, plaintiff was again laid off for disciplinary reasons. He had cursed his supervisor who had told him that he would need a slip before he went to the First Aid Department for treatment for a purported illness. For this infraction, plaintiff was laid off from May 13 until May 19, 1975,

9. Previously, plaintiff had encountered other medical problems. In 1969, at different times, he had strained his back and shoulder and was treated for an injury received while playing football. In 1970, he hurt his leg playing basketball and in 1971, sustained a similar injury. Also in 1971, he was treated for ulcers.

10. The Company claimed that plaintiff had sustained his injury at home, but plaintiff was later able to collect workmen's compensation benefits for this injury.

and he was warned that if at any time in the future he talked in a disrespectful manner to his supervisor or engaged in similar activity, his services with the Company would be terminated.

In October 1973, plaintiff had filed a formal charge with the Equal Employment Opportunity Commission, alleging racial discrimination in the transfer and promotion practices in effect at defendant's plant. In a written determination dated October 9, 1974, the Birmingham, Alabama District Office of the EEOC concluded that there was reasonable cause to believe that the defendant had discriminated against black employees because of race by maintaining a testing requirement for transfer into certain departments and by maintaining a high school education requirement for transfer into the N. C. Department. Plaintiff and representatives of the defendant were invited to engage in a conciliation process in an effort to resolve the dispute.

Negotiations between the parties subsequently led to a meeting on June 12, 1975, whereby the work of the N. C. Department was outlined to the plaintiff in detail. Plaintiff was told that very expensive equipment was operated in the Department, that it was necessary to keep the equipment operating as nearly as possible 100% of the time, and that therefore it was important that personnel be present at work the full eight hours a day and a full five days a week. Plaintiff indicated that he understood, stating that he was interested in doing a good job for the Company. Accordingly, on June 16, 1975, plaintiff was transferred into the N. C. Department. At the time of the transfer, there were eighteen employees in the N. C. Department, and plaintiff was the first black transferred in.

On October 24, 1975, plaintiff was advised that it would be necessary to lay off certain employees in the N. C. Department because of a lack of work. However, his seniority gave plaintiff the right to claim a job in another department if he wished to continue to work for the Company at a lesser rate of pay. In spite of this offer of another position with the defendant, plaintiff declined to work elsewhere and took a voluntary lay-off effective October 24, 1975. Following this lay-off, plaintiff attempted unsuccessfully to obtain unemployment compensation from the Department of Employment Security of the State of Tennessee. When his claim for unemployment benefits was denied, he returned to work with defendant on January 19, 1976 in the Autostat Department.

Plaintiff did not prove to be a successful or cooperative transferee into the N. C. Department. On one occasion, when a supervisor instructed him to take home for review certain literature pertaining to his duties, plaintiff replied that he was not being paid to go to school. In October 1975, he received a verbal warning because his work the previous week had resulted in scrapping over $300 in parts. In June of 1976, a machine in the N. C. Department had to be returned to the manufacturer for a period of some four weeks for repairs and replacements because plaintiff had been inattentive in operating it. Again on September 16, 1976, an excessive number of parts produced by plaintiff's work had to be scrapped.

On March 12, 1976, plaintiff filed another charge of discrimination with the EEOC, incorporating his previous charge and further claiming that he had been denied departmental seniority when he had been transferred into the N. C. Department in June 1975. On June 7, 1976, when work in the N. C. Department increased, plaintiff was returned to his job there. Having received a right-to-sue letter in April, plaintiff filed this action on June 24, 1976.

In August 1976, plaintiff missed several days from work because of a spider bite. Then, commencing on Tuesday, September 21, 1976, various events transpired which led to plaintiff's suspension and final discharge. On that date, plaintiff telephoned Mr. George Barnes, defendant's Director of Industrial Relations, and was given permission to be absent from work for two days to take care of business. Returning to work on Thursday, September 23, 1976, plaintiff became upset when his supervisor directed

him to do a non-machine job. Following receipt of a message from his girl friend, he telephoned her at a hospital that evening during the regular break. He also telephoned his attorney, and as a result of these calls was late returning to work after the break. He was then reprimanded by his supervisor for being late. During the eight-hour shift that day, he had turned out one hour's production. The next day, a Friday, he did not appear for work but telephoned, stating that he had business to attend to that day.

On Monday, September 27, 1976, a letter was addressed to plaintiff by Mr. Joe F. Johnson, Production Superintendent, advising that he was being given a two-week disciplinary lay-off beginning Monday, September 27 through and including Friday, October 8, 1976. Plaintiff was instructed to return to work on Monday, October 11. In this letter, the following reasons were given for the disciplinary lay-off:

> Since January 19 of this year, you have been absent from work 24 days or 14% of the time. This does not include the five days you were let off for personal business, nor does it include all the days you left early or reported to work late.

> In addition to this unacceptable absentee record, you have become completely uncooperative in job assignments. This past Thursday, September 23, you reported for work after having been absent for two days and demanded to be put on the machine which had been set up and was being operated by another operator. You threatened supervision, generally harrassed fellow employees and performed approximately one hour's work out of the seven and one-half hours.

On Monday, September 27, 1976, plaintiff went to see Dr. Walter Hardy and informed the doctor that his back was "beginning" to bother him again and that his job made him nervous. Dr. Hardy advised plaintiff to rest up from his job and prescribed a tranquilizer. After September 27, 1976, plaintiff did not call any representative of defendant and advise that he was under treatment by his doctor, nor did he give any other reason for his continued absence.

Plaintiff did not return to work on October 11, 1976, as he had been instructed to do, nor did he communicate in any way with his employer. Nine days later, by letter dated October 20, 1976, plaintiff's employment with the Company was terminated.

## II

### *The failure to transfer claim*

#### (a) *The first step—plaintiff's burden*

■ When these facts are considered under the standards of *McDonnell Douglas v. Green, supra*, it is clear that plaintiff has adequately shown that he belongs to a racial minority, that he applied for a transfer to a position for which his employer was seeking applicants, that he was initially rejected in 1971 and that other white applicants were in fact transferred into the position between 1971 and 1975. Therefore, insofar as the first step in the *McDonnell* test is concerned, the key issue in this case is whether plaintiff was qualified for transfer into the N. C. Department in 1971 or at any time up to June 16, 1975, when his application for transfer was finally approved.

After considering the evidence produced and giving due weight to the credibility of the witnesses, this Court concludes that plaintiff has not met his burden of proving that he was qualified for transfer into the N. C. Department in 1971 or at any time thereafter until June 1975. What the evidence discloses here is a young man with many personal problems in the years between 1971 and 1975, which are the critical years insofar as the first issue in this case is concerned. Plaintiff started working with the defendant when he was just barely eighteen years of age. He was then married and before long was the father of three young children. When he applied for transfer into the N. C. Department in 1971, plaintiff, who was then working in the Corrugating Department, had previously had little or no experience with machine cutting tools or in the reading of defendant's blue-

prints. During the years 1972 to 1973, he encountered marital problems, was separated from his wife, and had difficulty meeting his obligation to support his wife and children. Unable to pay his debts, his financial situation became so acute that in 1971 he went through voluntary bankruptcy proceedings. During this period, his health was poor, and in 1974 he was hospitalized and lost three months because of a back condition. Besides his back problems, he also suffered from ulcers.

As a result of these misfortunes, plaintiff missed a great deal of time from work in the years 1970 to 1975. Not counting periods of time in 1971 when he was laid off for lack of work, in 1973 when he was discharged, in 1974 when he did not work because of his back injury, and in 1975 when he was laid off and did not accept another job with the Company, plaintiff was absent from work or left work early a total of 182 days between 1971 and the date of his discharge.[11] When warnings from his superiors concerning his unexcused absences or tardiness resulted in little change in his working habits, plaintiff was discharged on May 16, 1973 because of his excessive absenteeism. Through the intervention of his Union, he was rehired effective July 30, 1973, at which time he promised to mend his ways. Unfortunately, this promise was short-lived. His tardiness, absenteeism and poor work performance continued even after he was finally accepted into the N. C. Department. Indeed, in 1976 up until the time that he was finally terminated, his record of absenteeism was even worse than in earlier years. Finally, in September 1976, plaintiff was suspended because of his absenteeism and uncooperative attitude. When he did not return to work after the suspension or otherwise communicate with the defendant, his employment was finally terminated on October 20, 1976.

As unfortunate as were plaintiff's domestic, financial and medical problems, many of which were undoubtedly beyond his control,

he could hardly expect to continue to absent himself from his work and still qualify for a higher-paying position. Defendant was looking for dependable employees to operate the expensive new machines, particularly in the early years when the Department was first being organized. On the record here, this Court finds that defendant was reasonably justified in concluding that plaintiff's qualifications for transfer to the N. C. Department in 1971 did not measure up to those of other applicants. Moreover, when there was little improvement in his work record after 1971, defendant could justifiably have declined to transfer him at any time before July 1975.

It was plaintiff's success before the EEOC which finally led to his transfer into the N. C. Department in July of 1975. In 1972, this Court had ruled against defendant in an earlier Title VII case instituted by other black employees. *See Bragg v. Robertshaw Controls Company*, 355 F.Supp. 345 (E.D.Tenn.1972). The *Bragg* case was a class action brought against Robertshaw and two unions challenging departmental seniority rules in effect prior to July 1, 1975 insofar as they affected black employees in the Service Department. Then, in October 1974, the EEOC had made an adverse determination concerning the charges brought against Robertshaw by plaintiff. Thus, defendant was under some pressure to take affirmative action to guarantee that blacks were not denied equal employment opportunities in any of its departments.

Accordingly, defendant undertook to settle the differences between it and plaintiff. Defendant eventually agreed to transfer plaintiff in spite of his poor work habits and decided to undertake to train plaintiff to perform his new duties. At the time agreement was reached, plaintiff was specifically told that it was necessary to keep the very expensive equipment in the Department operating fully at all times, and his superiors stressed the importance of N. C. Department personnel being present a

---

11. Although it contains a few discrepancies, defendant's Exhibit No. 21 supports such a finding.

full eight hours a day and a full five days each week. These instructions, like the earlier ones, apparently fell on deaf ears. Exclusive of time in 1976 when he was laid off, plaintiff was absent or left work early on over 20% of the working days in 1976 before he was finally discharged in October 1976.

In seeking relief in this case, the principal argument advanced by plaintiff is that the qualifications adopted by defendant for the transfer of an employee into the N. C. Department were racially discriminatory. Relying on *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), plaintiff contends that defendant's requirements that an applicant be a high school graduate and that an applicant achieve a certain score on the E. F. Wonderlic and the Bennett Mechanical Comprehension Tests had a disparate and adverse impact on black applicants, and that he was therefore denied a transfer because of his race. In response, defendant asserts that plaintiff has always been treated as a high school graduate and that his failure to have a high school diploma was in no way related to the rejection of his application for transfer into the N. C. Department. Conceding that the Wonderlic and Bennett Tests may have been condemned by the Supreme Court in *Griggs* and *Albermarle Paper Co.,* defendant argues that in any event the results achieved by plaintiff on those tests had little to do with its refusal to transfer him.[12]

The evidence here discloses that the N. C. Department was a new and somewhat experimental venture. At the outset, the qualifications, which were general and not clearly defined, included an attitude of "ea-gerness to learn new things" and "an agreeable cooperative personality." Whatever effect the Wonderlic and Bennett tests might have had on the applications of other black employees seeking a transfer to the N. C. Department, the evidence in this case indicates that it was not plaintiff's scores on these tests which caused the rejection of his application for a transfer. When the individualized circumstances pertaining to plaintiff's work record with the Company are considered, this Court concludes that plaintiff was not transferred into the N. C. Department because he was not qualified for the transfer. Plaintiff's application was rejected because of his poor work habits which did not improve after 1971 when he was first turned down. Thus, assuming *arguendo* that the testing system was discriminatory, plaintiff was not thereby injured because he was not qualified and would not have been transferred in any event. *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 404, n. 9, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 369, n. 53, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). *Cf. Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 285–287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *East Texas Motor Freight System,* the Supreme Court, reversing a decision of the United States Court of Appeals for the Fifth Circuit, upheld findings of the District Court that the plaintiffs in that case lacked the qualifications to be "line" truck drivers and therefore could have suffered no injury as a result of the discriminatory practices relied upon.[13] 431 U.S. at 403–4, 97 S.Ct. at 1897.

Plaintiff also relies heavily on the determination in his favor made by the EEOC in October 1974. But, that ruling, which was

---

**12.** The *Griggs* principles have ordinarily been applied in cases where the tests have been employed to preserve longstanding past discrimination. *See Bailey v. American Tobacco Co.,* 462 F.2d 160 (6th Cir. 1972); *Sims v. Sheet Metal Workers Int. Ass'n, Local Union No. 65,* 489 F.2d 1023, 1026 (6th Cir. 1973). In view of defendant's concession and this Court's findings herein, it is not necessary to determine whether *Griggs* should likewise be applied in a case such as this one involving a transfer into a newly-created department.

**13.** Among the significant facts cited by the Supreme Court as supporting these findings were warning letters placed in the plaintiff's files relating, *inter alia,* to absences from work, violations of company policy, and low productivity.

admitted in evidence at the trial, is not directly relevant to the controversy before this Court. *See Heard v. Mueller Company,* 464 F.2d 190, 194 (6th Cir. 1972). On a record quite different from the one now before the Court, the EEOC found in its determination of October 9, 1974 that the defendant was guilty of discrimination against plaintiff and other blacks because of race by requiring them to submit to the Wonderlic Personnel Test and the Bennett Mechanical Comprehension Test for transfer into the Numerical Control Department. The EEOC did not consider whether or not plaintiff was qualified for the transfer and was therefore injured by the testing system it found to be discriminatory. *See East Texas Motor Freight System, Inc. v. Rodriguez, supra.* As discussed hereinabove, the record here shows that plaintiff was not denied transfer because of his scores on these tests, but because of his poor work record.[14]

█ Plaintiff further relies on statistical evidence concerning defendant's employment practices in support of his contention that the Company's refusal to transfer him to the N. C. Department was racially motivated. Plaintiff asserts that his rejection by defendant conforms to a general pattern of discrimination by the Company against blacks. But statistical evidence does not automatically make out a prima facie case, *see Opara v. Modern Mfg. Co.,* 434 F.Supp. 1040, 1044 (D.Md.1977), and the statistics in evidence are not particularly helpful to plaintiff in this case. The proportion of blacks employed by defendant at its Knoxville plant (approximately 5.5%) closely paralleled the proportion of blacks in the overall work force in the Knoxville SMSA area in 1975 (approximately 6.2%). *Smith v. Troyan,* 520 F.2d 492, 497–498 (6th Cir. 1975); *Stone v. FCC,* 151 U.S.App.D.C. 145, 161, 466 F.2d 316, 332 (1972).

When the new N. C. Department was first established in 1971, there were only four employees who were transferred. Plaintiff relies on the fact that all four of these early transferees were white. But this statistical sample was too small to be meaningful. *Morita v. Southern California Permanente Medical Group,* 541 F.2d 217, 219–220 (9th Cir. 1976). As the Court observed in *Harper v. Trans World Airlines, Inc.,* 525 F.2d 409, 412 (8th Cir. 1975), statistical evidence derived from an extremely small universe "has little predictive value and must be disregarded." When plaintiff was finally transferred into the N. C. Department in 1975, there were eighteen employees and he was the first black. At this particular time, the statistics became more meaningful, but like the overall work force, the proportion of blacks to whites in the N. C. Department was then roughly comparable to that in the entire Knoxville area. In any event, the generalized facts concerning the racial composition of defendant's labor force are entitled to little weight in this case in which the critical issue relates to an individualized decision as to a particular employee. *See McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 805, n. 19, 93 S.Ct. 1817.

In *International Brotherhood of Teamsters v. United States, supra,* the Supreme Court made the following observation (431 U.S. at 358, n. 44, 97 S.Ct. at 1866):

An employer's isolated decision to reject an applicant who belongs to a racial minority does not show that the rejection was racially based. Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant; an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.

---

14. The second conclusion of the EEOC in that case, namely that defendant had discriminated against blacks as a class by maintaining a high school education requirement for transfer into the N. C. Department, is likewise not pertinent to the issues in this case.

On the record here, this Court concludes that plaintiff has not met his initial burden because he has failed to prove that he was qualified for the position he sought. Title VII was designed only to eliminate discrimination and not to require the hiring or promotion of unqualified personnel. *Thompson v. McDonnell Douglas Corp.,* 552 F.2d 220, 222 (8th Cir. 1977).

#### (b) *The second step—defendant's burden*

Even were this Court to find that plaintiff had met his initial burden under *McDonnell Douglas Corp.* of establishing a prima facie case of racial discrimination, the record here supports a finding that defendant has proven that there was a legitimate, nondiscriminatory reason for the rejection of plaintiff's application for a transfer to the N. C. Department between 1971 and 1975. Much of the previous discussion likewise applies here. Defendant did not transfer plaintiff initially in 1971 or at any time up until June 16, 1975 because of his record of excessive absences, because of his poor attitude toward his work assignments and because of his lack of experience.

This is not a case like *Brown v. Rollins, Inc.,* 397 F.Supp. 571, 579 (W.D.N.C.1974) in which the evidence did not show that the employee because of her tardiness and poor work habits was any less qualified for the position she sought. Here, it was essential that employees in the newly-organized N. C. Department be highly motivated and regular in their attendance. The expensive new machines required continuous operation if their costs were to be justified. Plaintiff's previous work history with the Company was thus a legitimate, nondiscriminatory reason for defendant's refusal to transfer him into the new Department during the years in question.

#### (c) *The third step—pretextuality*

The credible evidence here likewise shows that the reasons given by defendant for refusing to transfer plaintiff to the N. C. Department were not pretextual. As discussed hereinabove, plaintiff's poor work habits continued over a period of years, and defendant was justified in relying on them in rejecting plaintiff for this particular position.

Plaintiff argues that the recommendations of his superiors which resulted in the rejection of his application for transfer were subjective ones, made by white supervisors who acted with a discriminatory intent. In some other case, subjective evaluations concerning the dependability and work habits of a black employee made by a white foreman accustomed to working principally with members of his own race might well be treated with skepticism. *See Rowe v. General Motors Corporation,* 457 F.2d 348, 359 (5th Cir. 1972). But here, the opinions expressed by plaintiff's white supervisors concerning his lack of dependability and his poor attitude were supported by objective facts. Plaintiff's personal problems and absences from and inattention to his work over a period of years are well documented in the record. The evidence then does not support the contention that the adverse evaluations by plaintiff's foreman were racially motivated.

The most significant objective fact was his discharge in 1973. The reasons for that discharge were so well documented that plaintiff made no claim at the time that he was terminated because of his race.[15] Apparently conceding that his work habits had been inadequate, plaintiff instead went to his Union and with its help, asked for and was given another chance by the Company, based on his promise to do better. The reasons for his discharge were spelled out in writing in the Agreement under which he was rehired, and he was expressly warned that excessive absences in the future or a poor attitude with respect to his work assignments would result in the termination of his employment.

Plaintiff also complains that after he was transferred into the N. C. Department, he was singled out and closely watched by his

---

**15.** When he filed a formal charge of racial discrimination with the EEOC in October 1973, he did not claim that his discharge earlier that year had been racially motivated.

supervisors. That plaintiff's supervisors checked on his attention to his duties in the N. C. Department is hardly surprising. Defendant was reasonably justified, in view of plaintiff's previous history of poor work habits, to monitor his activities more closely than those of some other employee to determine whether plaintiff could measure up to the standards required for employees working in this new department. The close supervision here was not racially motivated but was the result of the poor record of performance exhibited by plaintiff during prior years. There is no evidence in this case that defendant created intolerable working conditions with the deliberate intent of causing plaintiff to absent himself from his job. See Thompson v. McDonnell Douglas Corp., 552 F.2d 220, 223 (8th Cir. 1977).

It is further argued by plaintiff that other white employees with equally bad records were not disciplined or discharged as he was. The proof does not support this contention. Plaintiff has not shown that the work habits of any of the white employees who were transferred into or retained in the N. C. Department were as consistently poor as were his. On the contrary, the evidence discloses that he missed more time from work than anyone else in the Department.

Accordingly, the evidence does not indicate that defendant used plaintiff's conduct as a pretext for discriminating against him on account of his race.

### III

#### The retaliatory discharge claim

The discharge of an employee after he has filed charges with the EEOC and after he has sued his employer under Title VII should be viewed with suspicion. On the other hand, an unsatisfactory employee should not be entitled to insulate himself from justifiable disciplinary action merely because he has filed charges of discrimination against his employer and has followed up by filing suit. Just as it is incumbent upon an employer not to retaliate against an employee because he seeks to assert rights guaranteed by federal law, so it is incumbent upon the employee to perform his duties faithfully during the pendency of his suit.

The record here discloses that plaintiff did not meet his obligations in this regard. The excuse he gave for not coming to work on Friday, September 24, 1976 was that he had business to attend to.[16] Later, he apparently decided that he needed a medical excuse for missing work that day, and concluding that his back was "beginning" to bother him again, he went to see his doctor on Monday, September 27. However, the medical reason advanced by the plaintiff at trial for staying away from his job was never communicated to the defendant. This Court will credit the testimony given by the witness Doris Newman of defendant's First Aid Department, whose account was supported by a written record maintained by the Company. She testified that plaintiff called her on September 24 and gave a business reason for not coming to work that day. The conflicting testimony of plaintiff and his brother is rejected as highly implausible under all the circumstances of this case.

Plaintiff argues that defendant is at fault because after the suspension letter of September 27, 1976, no effort was made by defendant to contact plaintiff and hear his side of the story. But such a contention puts the shoe on the wrong foot. Having been previously suspended and even fired for excessive absenteeism, and having missed three out of five working days during the week of September 20, plaintiff was specifically put on notice by the letter of September 27 that further absences would not be tolerated, and that he should return to work on Monday, October 11.[17] Yet never once after he saw Dr. Hardy on September 27 did he advise defendant that he was

---

16. This was the same excuse he had given for two earlier absences that week.

17. Plaintiff admitted that he had received defendant's letter of September 27, 1976.

under treatment for his back.[18] No medical certificate was furnished on October 11 or at any other time. Plaintiff simply stayed away, with the result that he was fired shortly thereafter.

This Court concludes that plaintiff was not fired because he chose to assert rights guaranteed by federal law. Rather, he was discharged because he continued, in the face of many warnings, to ignore the responsibilities he had agreed to undertake as an employee of defendant and, in particular, as a transferee into the N. C. Department.

## IV

### Conclusion

For the reasons stated, judgment is hereby entered in favor of the defendant. This Court's findings of fact and conclusions of law, under Rule 52(a) of the Federal Rules of Civil Procedure, are embodied in this Opinion, whether or not expressly so characterized.

18. Moreover, although claiming to be physically unable to report for work on that day, plaintiff appeared in this Court on September 30, 1976 in connection with a scheduled hearing.