Alvin WARREN and Alfred
Warren, Plaintiffs,

v.

HALSTEAD INDUSTRIES,
INC., Defendant.

Civ. No. C–82–153–WS.

United States District Court,
M.D. North Carolina,
Winston-Salem Division.

April 26, 1985.

---

Harvey L. Kennedy, Harold L. Kennedy, III, Winston-Salem, N.C., for plaintiffs.

James E. Humphreys, Jr., Winston-Salem, N.C., James B. Spears, Jr., Greenville, S.C., for defendant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Plaintiffs Alfred and Alvin Warren instituted this action against Halstead Industries, Inc., seeking injunctive, declaratory, and monetary relief for alleged discrimination in employment because of their race. Plaintiffs allege that Defendant violated 42 U.S.C. § 1981 (the Civil Rights Act of 1866) and 42 U.S.C. § 2000e *et seq.* (Title VII of the Civil Rights Act of 1964) in various ways. The court granted partial summary judgment for the Defendant on October 21, 1983, and dismissed certain of the claims. The issues tried by the court during the five-day trial and remaining for decision are: (1) was Plaintiff Alvin Warren discharged on account of his race in violation of Section 1981; (2) was Plaintiff Alvin Warren discharged in retaliation for filing administrative charges of racial discrimination with the Equal Employment Opportunity Commission (EEOC) or for complaining to management about racial discrimination in violation of Section 1981; (3) were both Plaintiffs discharged in retaliation for filing administrative charges of racial discrimination with the EEOC or for complaining to management about racial discrimination in violation of Title VII; and (4) did the Defendant fail to promote both Plaintiffs to

various leadmen positions on account of their race in violation of Title VII?[1]

The court, having heard the testimony of witnesses for both sides and observed each witness's manner of testifying, and having considered the exhibits in the record, and the arguments and briefs of counsel, makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### Background

1. Plaintiffs Alfred and Alvin Warren are black former employees of the Defendant, both being hired on June 12, 1978. Prior to their employment with Defendant, both had graduated from high school and attended Winston-Salem State University for two years. Both are "employees" within the meaning of the provisions and coverage of Title VII and 42 U.S.C. § 1981.

2. Halstead Metal Products, Inc., is a subsidiary of Halstead Industries, Inc., a Pennsylvania corporation licensed to do business in the state of North Carolina and engaged in the manufacture of copper tubing. The company is an "employer" as defined under Title VII and is subject to the court's jurisdiction under 42 U.S.C. § 1981.

3. The company began production of copper tubing at its plant in Pine Hall, North Carolina, in December 1977. Prior to the start-up of production, the company's employees were engaged in the construction of the plant. Construction continued simultaneously with production after December 1977 but was eventually phased out after the plant's completion in June 1979. During the time Plaintiffs were employed by the Defendant, the Defendant had four departments: (1) production; (2) construction; (3) maintenance; and (4) machine shop.

4. Plaintiffs were each hired by the company's personnel manager, Clyde Allen, white, on June 12, 1978, in B-bay of the production department. At the time of hiring, they were given a copy of the company's employee handbook and informed of the company's policies and procedures, including the company's policy of promoting the most qualified employees with the greatest departmental seniority to available positions.

### The Promotion Claims

5. Plaintiffs' claims of racial discrimination in promotion center around the company's promotion of three white individuals to leadmen positions in the B-bay area of the production department. These individuals were Greg Smothers, Jimmy Gann, and Steven Boles. Smothers was hired by Defendant as a utility laborer in the construction department on May 9, 1977, and transferred into B-bay of the production department as a draw bench helper in December 1977. Thus he was already employed in that department on June 12, 1978, when Plaintiffs were hired. Smothers never worked in construction after December 1977. He was promoted to leadman in B-bay of the construction department on September 11, 1978.

6. Jimmy Gann was employed by Defendant as a utility laborer in the construction department on March 29, 1978, and transferred into B-bay of the production department on May 12, 1978. Thus he was already employed in that department when Plaintiffs were hired. He never worked in construction after May 1978. Because Gann had transferred to the production department prior to the completion of his ninety-day probationary period, his initial hire date became his departmental seniority

---

**1.** In its memorandum opinion of October 21, 1983, on summary judgment, the court left open the questions of whether a claim for retaliatory discharge for filing a charge of discrimination with the EEOC is actionable under 42 U.S.C. § 1981, and whether the same claim may be pursued in court under Title VII without first filing an administrative charge based on such discharge with the EEOC. However, for the purposes of its decision in this case, the court has considered the retaliatory discharge claims to be properly before it under both Section 1981 and Title VII.

date in the production department in accordance with company policy. Even so, Gann had been working in the production department for approximately a month when Plaintiffs were hired.

7. Steven Boles was employed by Defendant on July 31, 1978, approximately six weeks after the Plaintiffs were hired. On December 18, 1978, he was promoted to a temporary leadman position in B-bay for two weeks while his regular leadman and supervisor were on vacation. Defendant's witnesses testified that Boles returned to his bench operator's position after two weeks, although his employee service record indicates that he held this position until he was made a bench operator leadman on March 23, 1979, after Plaintiffs were terminated. Since there were no leadman vacancies open in December 1978 and both Boles' leadman and supervisor did return to work from vacation, the company's records mistakenly failed to note that Boles returned to his normal job assignment after these two weeks.

8. Defendant used departmental seniority as the primary criterion for promoting employees to available leadmen positions. When an opening occurred, the employee with the most departmental seniority was promoted unless he was not qualified or did not want the position. Both Greg Smothers and Jimmy Gann had greater company seniority and greater departmental seniority than did either Plaintiff. Consequently, neither Plaintiff was actually considered for promotion to leadman by the white department manager, Bill McClain. Although Steven Boles began work for the Defendant approximately a month and a half after the Plaintiffs, he was not actually promoted to leadman but only filled in as a temporary substitute for his leadman and supervisor for a period of two weeks.

9. During the time Plaintiffs were working at the company, the Defendant had black leadmen, including Jerry Joyce, in the casting department, and Carl Millner, in the annealing furnace. Prior to February 2, 1979, the date of Alvin Warren's termination, two other blacks, Gary Calloway and Carl Scales, were promoted to leadmen in B-bay.

### The Discharge Claims
#### Alfred Warren

10. Plaintiff Alfred Warren is a black citizen of Winston-Salem, North Carolina, and was hired by the Defendant on June 12, 1978, as a utility laborer in its plant in Pine Hall, North Carolina. Prior to his employment with Defendant, he had graduated from high school and attended Winston-Salem State University for two years. He had also held summer jobs at R.J. Reynolds Tobacco Company and Duke Power Company, and had worked at McLean Trucking Company for eight months. Alfred Warren successfully completed his ninety-day probationary period on September 12, 1978. He experienced attendance problems after completing probation and received several progressive disciplinary warnings in accordance with Defendant's employee handbook. On December 8, 1978, he was given a written warning because he had been absent nine days in a three-month period and late or absent from work twelve other part days. On December 29, 1978, he received a second written warning and a three-day suspension for continued absences and lateness.

11. Alfred Warren was absent from work on January 15, 16, and 20, 1979. A doctor's note was turned in by him dated January 16, 1979, stating that he was under a doctor's care for "fatigue syndrome." The company did not consider this note to be a satisfactory medical excuse for his recent absences, since it did not state that he had to be out of work for any period of time. On January 20, 1979, Plaintiff's third day of absence during that week, company officials made their decision to terminate him. Tommy Cook, white, assistant personnel manager, planned to meet Plaintiff when he reported to work for the third shift on January 21, 1979, to notify him of his termination. Plaintiff was again absent from work on January 21, 1979. When Plaintiff came in on January 22,

1979, Cook met with him and notified him of his termination.

12. Plaintiff filed a charge of racial discrimination with the Charlotte, North Carolina, district office of the EEOC on January 15, 1979. Clyde Allen, Defendant's personnel manager, received notice of this charge by mail from the EEOC on January 23, 1979. Prior to this time, Plaintiff had also complained to management about the promotions of Greg Smothers and Jimmy Gann to leadmen.

13. During Alfred Warren's employment, twenty-two employees were discharged for attendance and tardy violations. According to Defendant's practice, there was no specific number of absences or tardies which triggered discipline or termination and the company evaluated the individual circumstances surrounding the employee's absences and tardies and the reasons therefor. The company does not have excused or unexcused absences. Company regulations provide for a written warning for a first offense of excessive absenteeism, a three-day suspension for a second offense, and discharge upon the third offense.

14. Some employees discharged for attendance problems had fewer total absences than Alfred Warren and other employees had more absences before being discharged. Plaintiff points to two white employees, Powell Whitten and Preston Wylie, Jr., who had more absences and tardies than he did before they were terminated.

15. Powell Whitten was employed in Defendant's construction department on January 3, 1978, and discharged for excessive absenteeism on December 1, 1978, after he had transferred into the production department. In the Defendant's construction department during early 1978, unlike the production department, attendance discipline was left to individual foremen and prior to a union campaign in mid-1978 it was not enforced as strongly as it was in the production department. In mid-1978, after a union began an organizing campaign among Defendant's employees, Defendant began to centralize its discipline

procedures for both the construction and production departments within its personnel department. After Whitten transferred into production, he received a written warning, suspension, and discharge for excessive absences consistent with Defendant's policy. Just prior to his termination he was out of work for several weeks with an on-the-job injury, and these days were included in his total of 78 days absent.

16. Preston Wylie, Jr., worked at Halstead from July 31, 1978, until May 29, 1980. During that period he had 43 absences and 23 tardys. His employment record shows three suspensions before discharge. However, Wylie was among striking employees who returned to work after a strike, and the company adopted a policy for all strikers upon reinstatement establishing that their last level of discipline before the strike would be repeated if further discipline was applied after the strike. Prior to the strike Wylie received a suspension. He received another suspension after the strike instead of being discharged because of the policy applied to returning strikers. A third suspension for Wylie was an erroneous notation in the file because it had been given wrongfully by Wylie's supervisor and later countermanded by management.

### Alvin Warren

17. Plaintiff Alvin Warren was hired at Halstead on June 12, 1978, after graduating from high school and attending Winston-Salem State University for two years. He had worked at summer jobs in construction for Duke Power Company and I.L. Long Construction Company and at Schwartz Steel Company. He successfully completed his probationary period on September 12, 1978.

18. Alvin Warren was terminated on February 2, 1979, for wasting company time and for failure to cooperate with his foreman. Prior to his discharge, he received a written warning for absenteeism on December 11, 1978, a written warning for lack of cooperation on December 20, 1978, and a written warning and three-day

suspension for wasting company time on January 11, 1979.

19. Clyde Allen gave Plaintiff the December 20, 1978, written warning for lack of cooperation. Allen told Plaintiff what the company considered lack of cooperation to be, including starting late, taking too long on breaks, and failing to follow instructions of his foreman. Plaintiff's leadman, Greg Smothers, talked to Plaintiff a number of times about his wasting company time by spending too long on breaks and too much time in the bathroom. Smothers and Larry Sands, Plaintiff's foreman, kept notes of these instances. As a leadman, Smothers' responsibilities included keeping an employee's machine running while the employee was on break, so Smothers was particularly aware of the length of the breaks of employees on his shift. The notes spanned a period of time from December 4, 1978, to February 1, 1979, the day before Plaintiff's termination. Plaintiff continued to waste company time and the decision to terminate him was made by Bill McClain, the department manager, and Larry Sands, both white, and was approved by Clyde Allen.

20. Alvin Warren complained to management regarding the promotions to leadmen received by Greg Smothers and Jimmy Gann. He also complained to Clyde Allen that Greg Smothers had been yelling at him. Allen talked to Smothers, who told Allen that he did yell at Plaintiff and other employees in B-bay because of the noise level. On January 15, 1979, Plaintiff filed a charge of racial discrimination with the Charlotte, North Carolina, district office of the EEOC. On January 17, 1979, after his three-day suspension, Plaintiff met with Clyde Allen and Tommy Cook and told them that he did not feel blacks had any opportunities for advancement with the company.

21. Several white employees were terminated in 1978 and 1979 for reasons similar to those for which Alvin Warren was discharged on February 2, 1979. Vernon Carter, a white employee, was discharged on January 20, 1979, for failure to cooperate with his foreman and for restricting production by failing to do his work. Roger Carter, a white employee, was terminated on June 29, 1978, for abusing break time. David Browning, a white employee in construction, was discharged on April 4, 1978, for lateness and not staying on the job. Robert Carter, a white employee, was terminated on October 24, 1978, for taking extended breaks.

22. On December 19, 1978, Alvin Warren and several other employees, including George Goolsby and Gary Calloway, both black, sought a meeting with John Terlinden, white, the plant manager, just before their shift started at 11:00 p.m. They told their foreman, Larry Sands, that they wanted to discuss their concerns about racial discrimination in promotions with Terlinden. Neither Clyde Allen nor Terlinden were at the plant that night and the employees were instructed by Sands to return to work. These employees did not receive any warning notices for this incident, but Alfred Warren did receive the warning notice dated December 20, 1978, later during that shift for wasting company time.

23. Although Plaintiff testified that the company increased its harassment of him after December 19, 1978, other employees who sought a meeting with the plant manager on December 19, 1978, were not retaliated against because of their involvement. Gary Calloway was promoted to leadman in January 1979, one month after the attempted meeting. George Goolsby also became a leadman in 1979, and subsequently received another promotion to foreman. Calloway and Goolsby, as indicated, are black.

24. Both Plaintiffs testified at length about alleged harassment by the Defendant after they had made complaints to management. They testified that Greg Smothers, Jimmy Gann, and Larry Sands would come up behind them and rub Plaintiffs' buttocks with their hands, laugh, and tell them they were not cooperating with management. They testified that they interpreted "cooperate with management" to mean that they should engage in homosexual activities. Plaintiffs did not bring to

the attention of management during their employment any complaints about supervisors rubbing them or trying to get them to engage in homosexual activities. Gann and Smothers testified that they never rubbed the Plaintiffs on the buttocks or anywhere else.

## DISCUSSION

▆▆▆ The Plaintiffs' claim in this case that the Defendant subjected them to unlawful discrimination and retaliation in violation of Title VII and Section 1981. The evidentiary flow of a disparate treatment case is now well established. Under Title VII and Section 1981, the elements of a prima facie case are the same. *Gairola v. Virginia Dept. of General Services,* 753 F.2d 1281, 1285 (4th Cir.1985); *Lewis v. Central Piedmont Community College,* 689 F.2d 1207, 1209 n. 3 (4th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983). To succeed on a disparate treatment theory in the absence of direct evidence of discrimination, the Plaintiffs must prove that Defendant treated non-minorities more favorably than it did them with an intent to discriminate, although a discriminatory motive may be inferred in certain circumstances from the mere fact of differences in treatment. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Absent direct evidence of discriminatory treatment, or of indirect evidence that but for the Plaintiffs' race or racial complaints they would not have been denied promotions or discharged, the guidelines set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), may be used "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981); *see also Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 242 (4th Cir.1982) (ADEA case). The initial burden is upon the plaintiff to establish a prima facie case of racial discrimination. That being accomplished, the employer is obligated to come forward with a legitimate non-discriminatory reason for its action. At this point, the plaintiff is given a final opportunity to make out his case by establishing that the stated reason is pretextual. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25. Despite the shifting of these intermediate burdens of production, the ultimate burden of persuasion remains on the plaintiff throughout the proceedings. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Although *McDonnell Douglas* was a refusal to hire case, the principles it sets forth for the prima facie case have been applied in discharge cases. *See, e.g., Gairola v. Virginia Dept. of General Services,* 753 F.2d at 1286. They may be applied in discriminatory promotion cases as well. *See, e.g., Wright v. National Archives and Records Service,* 609 F.2d 702, 714 (4th Cir.1979).

The court is aware of the dangers in attempting to apply the *McDonnell Douglas* formula too rigidly, and that a prima facie case may be established by various means. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957 (1978). The central focus in any disparate treatment case is whether the employer is treating some of its employees less favorably because of their race, color, religion, sex, or national origin. *International Brotherhood of Teamsters v. United States,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. As noted, the *McDonnell Douglas* presumption need not be resorted to when the claimant has carried his original production burden on the motivational issue by direct evidence or by indirect evidence establishing that but for the claimant's race he would not have been treated unfavorably. *Lovelace v. Sherwin-Williams Co.,* 681 F.2d at 242. The court does not believe, however, that such independent evidence has been presented in this case with the possible

exception of the discharge claim of Alvin Warren, as discussed *infra*. Regardless, since the Defendant failed to persuade the court to dismiss the action for lack of a prima facie case, and offered evidence of the reasons for the Plaintiffs' adverse treatment, the proper focus for the court is whether the Defendant intentionally discriminated against the Plaintiffs. *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

## CONCLUSIONS OF LAW

### The Promotions Claims

■ The Plaintiffs assert that white employees with less seniority were promoted to the leadmen positions which they sought for discriminatory reasons. The court disagrees. The three instances cited by the Plaintiffs are not persuasive. Both Greg Smothers and Jimmy Gann were hired before the Plaintiffs and had more departmental seniority than they did. Their promotions were in accordance with company guidelines. There is no evidence that this policy was a pretext for discrimination. Indeed, Plaintiffs do not attack the policy, arguing only that their seniority entitled them to the promotions. Although Stephen Boles had approximately six weeks less

seniority than the Plaintiffs, his promotion to leadman was only a temporary one for two weeks. For the court to conclude that this brief isolated occurrence is evidence of racial discrimination against the Plaintiffs requires a quantum leap which the court is unwilling to make.

### The Discharge Claims [2]

### Alfred Warren

The evidence in this case establishes that Alfred Warren was dismissed because he failed to satisfy his employer's reasonable performance expectations by which all of his fellow employees were regularly judged. Plaintiff's attendance problems were well documented. Before the January 1979 absences which led to his discharge, he was given a written warning on December 8, 1978, because he had been absent nine days in a three-month period and late or absent from work twelve other part days; on December 29, 1978, he received a second written warning and a three-day suspension for continued absences and lateness. He was absent from work on January 15, 16 and 20 before the company decided to discharge him. The company was unable to notify him of his discharge

**2.** Both parties introduced statistical data. Statistical evidence, however, is rarely determinative in individual disparate treatment cases. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. at 805 n. 19, 93 S.Ct. at 1826 n. 19; *Harper v. Trans World Airlines*, 525 F.2d 409, 412 (8th Cir.1975); *Opara v. Modern Manufacturing Co.*, 434 F.Supp. 1040, 1044–45 (D.Md.1977). *See generally* B. Schlei & P. Grossman, *Employment Discrimination Law* 1315–16 (2d ed. 1983) and cases cited therein. Plaintiffs' expert witness, using the binomial model, testified about Defendant's total termination statistics for 1978 and 1979, which Plaintiffs contend show that the number of blacks discharged was significantly more than would be expected in the absence of racial discrimination in discharges. However, the information used by Plaintiffs' expert for her statistical calculations related to two sets of data, total terminations and non-total work force, which limit their probative value. Even so, a number of standard deviations greater than 3, while ruling out chance as the cause of disparity in the termination rates, serves only to shift the burden to the employer

to come forward with a credible lawful explanation for the disparity. *See Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 336 n. 20 (4th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984). Statistics are not sufficient to prove pretext in individual disparate treatment cases. *See, e.g., Hudson v. IBM Corp.*, 620 F.2d 351, 355 (2d Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *King v. Yellow Freight System, Inc.*, 523 F.2d 879, 882 (8th Cir.1975); *Terrell v. Feldstein Co.*, 468 F.2d 910, 911 (5th Cir.1972).

The Defendant offered statistical evidence tending to show that black representation in Defendant's work force increased significantly in 1978 and 1979. However, an employer cannot rely on evidence of hiring members of a protected group in proportion to their share in the population or work force as a defense to specific acts of discrimination. *See Furnco Construction Corp. v. Waters*, 438 U.S. at 579, 98 S.Ct. at 2950; *Cross v. U.S. Postal Service*, 639 F.2d 409, 414 (8th Cir.1981).

The court does not view either party's statistical evidence as persuasive in this case.

on January 21 because he was absent again.

Plaintiff has attempted to prove that he was treated differently from white employees in that white employees were not discharged until their attendance records had become worse than his. Plaintiff pointed to two white employees, Powell Whitten and Preston Wylie, Jr., who had more absences and tardies than he did before they were terminated. Although it is true that Powell Whitten had more total absences than Alfred Warren, the company offered a reasonable explanation for this fact. Whitten's initial employment was in the Defendant's construction department, where attendance discipline was handled differently from that in the production department and not enforced as strongly until a union campaign in mid-1978. This is not uncommon in industry, and whatever inferences may be made about more rigid disciplinary procedures during a union campaign in the context of a National Labor Relations Board proceeding, it is not evidence of racial discrimination in this case. Furthermore, a large block of Whitten's absences occurred consecutively because of an on-the-job injury, a different situation from the numerous separate instances of absences in the case of Alfred Warren, albeit for a shorter total period of time.

The more favorable treatment that Preston Wylie, Jr., apparently received was reasonably explained by the company in that Wylie, upon returning from a labor strike, was allowed to repeat his last level of discipline after the strike, a policy applied to all returning strikers, whether black or white. Another suspension for Wylie was attributable to his supervisor who was disciplined as a result, and thus cannot be considered evidence of racial discrimination. Plaintiff has not persuaded the court that a discriminatory reason more likely than not motivated the Defendant or that Defendant's proffered explanation is unworthy of credence. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

 The fact that Plaintiff's discharge came on the heels of his EEOC charge is not by itself sufficient to sustain his retaliation claim. He must establish the causal nexus between the two events such that he would not have been terminated "but for" the EEOC filing. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365–366 (4th Cir.1985); *see also EEOC v. Federal Reserve Bank*, 698 F.2d 633, 669 (4th Cir.1983), *rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank*, —— U.S. ——, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); *Kralowec v. Prince George's County*, 503 F.Supp. 985, 1008 (D.Md.1980), *aff'd mem.*, 679 F.2d 883 (4th Cir.), *cert. denied*, 459 U.S. 872, 103 S.Ct. 159, 74 L.Ed.2d 132 (1982). An employee's discharge based on attendance, if properly established, is sufficient to rebut an inference of discrimination and shift the burden of production to the plaintiff in a disparate treatment case. *See, e.g., EEOC v. Federal Reserve Bank*, 698 F.2d at 665–69; *Wright v. Southwest Bank*, 648 F.2d 266, 267 (5th Cir.1981); *Leftwich v. U.S. Steel Corp.*, 470 F.Supp. 758, 766 (W.D.Pa.1979). Defendant's witnesses testified that they had no notice of the Plaintiff's January 15, 1979, charge when they made the decision to terminate him on January 20, 1979.[3] However, even if Plaintiff's supervisors had knowledge of the charge at the time, any inference that it was a consideration in their decision would be entirely speculative in view of the strong objective evidence of continuing absenteeism supporting termination. The company was even delayed in notifying the Plaintiff, once a decision to terminate Plaintiff had been made, because of his continued absence.

### Alvin Warren

Plaintiff Alvin Warren was terminated on February 2, 1979, for wasting company time and for failure to cooperate with his foreman. Prior to his discharge he had

---

**3.** If the employer does not know of the protected activity a causal connection to the adverse action cannot be established. *Ross v. Communications Satellite Corp.*, 759 F.2d at 365 n. 9.

received a written warning for lack of cooperation on December 20, 1978, and a written warning and three-day suspension for wasting company time on January 11, 1979. In addition, he had received a written warning for absenteeism on December 11, 1978. Because of the subjective nature of the alleged infractions, the documentary proof introduced by the Defendant does not establish infractions of company rules with the same clarity as the records of Alfred Warren's absenteeism. In addition, the written notations made by Alvin Warren's supervisors as to the instances of wasting time, while not unprecedented, were not the type of records routinely kept on all employees in B-bay of the production department. Therefore, the court must consider carefully the possibility that Defendant singled out Alvin Warren and proceeded to "build a record" to justify his discharge. Furthermore, there is no question but that by February 2 the Defendant had knowledge of the January 15, EEOC charges filed by both Plaintiffs. Alvin Warren's complaints to management about promotions and his treatment by supervisors are also uncontradicted.

Plaintiff's competence and job performance may be established on the judgment of his supervisors "in the absence of any evidence drawing its essential integrity into question." *Wright v. National Archives and Records Service*, 609 F.2d at 714; *accord Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980). In assessing the reasons offered by the Defendant for Plaintiff's discharge, the court's focus is not on Defendant's business judgment or the fairness of its actions, but on its motivation. The factual inquiry is on which party's explanation of the employer's motivation the court believes. The Plaintiff must persuade the court that a discriminatory reason more likely than not motivated the Defendant, or that the Defendant's proffered explanation is unworthy of credence. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. ■ The only evidence of Plaintiff's satisfactory performance of his duties in

this case came almost exclusively from his own testimony. However, the Plaintiff's evaluation of his own performance is not relevant. *Smith v. Flax*, 618 F.2d at 1067. While his EEOC charge was filed shortly before his discharge, neither Title VII nor 42 U.S.C. § 1981 requires an employer to immunize protected class members who have filed charges of discrimination from discharge despite their poor performance. *See Ross v. Communications Satellite Corp.*, at 366; *EEOC v. Federal Reserve Bank*, 698 F.2d at 668–69. To hold otherwise would allow an employee within a protected group to insulate himself from discipline by the mere act of complaining about alleged discrimination. *EEOC v. Federal Reserve Bank*, 698 F.2d at 668–69; *see also Ross v. Communications Satellite Corp.*, at 366.

■ Although Alvin Warren possibly established a prima facie case of discrimination through a combination of the timing of his EEOC charge and his discharge approximately two weeks later, together with the subjective nature of many of his alleged job deficiencies, the court cannot base a finding of racial discrimination or retaliation on mere speculation. In an attempt to establish that Defendant's proffered reasons for his discharge were pretextual, Plaintiff testified that white employees were not terminated for wasting time, that he was never told what failure to cooperate meant, and that he was constantly harassed by management.

Defendant offered evidence of several white employees who were terminated in 1978 and 1979 for reasons similar to those for which Alvin Warren was discharged. Four white employees were terminated in the months just preceding Plaintiff's termination for failure to cooperate and not staying on the job. Defendant also points out that other black employees who accompanied Alvin Warren on the December 19, 1978, attempt to meet with the plant manager concerning racial discrimination in promotions were later themselves promoted, thus creating a strong inference that the company did not discriminate against

employees in retaliation for voicing complaints. Defendant's personnel manager, Clyde Allen, explained to Plaintiff on at least one occasion, the time of the December 20, 1978, warning, what the company considered lack of cooperation. Plaintiff's leadman, Greg Smothers, also talked to him a number of time about it.

Plaintiff has not established a causal nexus between his EEOC charge and his subsequent discharge such that he would not have been terminated "but for" the EEOC filing. *Ross v. Communications Satellite Corp.*, at 365–366. Plaintiff had received written warnings for his conduct prior to filing his charge and the court is persuaded that his termination was for continuing the conduct for which he had been previously warned.

Both Plaintiffs testified that their supervisors would come up behind them and rub Plaintiffs' buttocks with their hands, laugh, and tell them they were not cooperating with management. They testified that they interpreted "cooperate with management" to mean that they should engage in homosexual activities. The court does not believe that Alvin Warren's discharge for failure to cooperate and for wasting time was in any way related to the alleged instances of fondling by his supervisors or his failure to submit to homosexual advances. Virtually the only evidence that such instances ever occurred was the testimony of the Plaintiffs themselves. The court has carefully considered the Plaintiffs' testimony in this regard, both on direct and cross-examination, and does not find it credible. The same may be said for much of the Plaintiffs' other testimony. As witnesses, Plaintiffs were equivocal, inconsistent, and often contradictory. Much of their testimony must be discounted by the court, making due allowances for their age, inexperience, and lack of familiarity with the role in which they found themselves on the witness stand.

For the foregoing reasons, it is concluded that:

1. The court has jurisdiction over the parties and over the subject matter of this action.

2. Defendant did not discriminate against the Plaintiffs because of their race by failing to promote them in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

3. Defendant did not terminate Plaintiffs in retaliation for their filing of administrative charges of racial discrimination with the Equal Employment Opportunity Commission or for complaining to management about racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

4. Defendant did not terminate Alvin Warren on account of his race in violation of 42 U.S.C. § 1981.

5. Defendant did not terminate Alvin Warren for filing administrative charges of racial discrimination with the Equal Employment Opportunity Commission or for complaining to management about racial discrimination in violation of 42 U.S.C. § 1981.

The court will enter a judgment simultaneously herewith dismissing this action in accordance with this memorandum opinion.